**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CRIMINAL NO. 20-cr-0097 (CKK) |
| ) | |
| v. ) | VIOLATIONS: 18 U.S.C. § 371 |
| ) | (Conspiracy to Commit Offenses) |
| ) | |
| DAVID SHAH, ) | |
| ) | |
| Defendant. ) | |

## STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States, by and through its undersigned attorneys, and David Shah ("**SHAH**"), with the concurrence of his attorney, Allen H. Orenberg, stipulate and agree that the following facts fairly and accurately describe **SHAH** conduct in the offense to which he is pleading guilty. These facts do not constitute all of the facts known to the parties concerning the charged offense and related conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that SHAH committed the offense to which he is pleading guilty. **SHAH** knowingly and voluntarily agrees that the following facts could be proven beyond a reasonable doubt at trial.

### *Relevant Entities, Contracts and Subcontracts*

1. The United States Army Intelligence and Security Command ("INSCOM") was a United States government agency headquartered at Fort Belvoir in Fairfax County, Virginia. Among its other duties, INSCOM delivered linguist support to United States Army components.

2. On or about September 7, 2007, INSCOM awarded contract W911W4-07-D-0010 ("Contract") to a government contractor headquartered in Ohio ("Prime Contractor"). The purpose of the Contract was to supply qualified linguists to serve in support of United States military operations in Afghanistan. The initial value of the Contract was approximately $703,000,000.

3. Subcontractor #1 was a private company headquartered in Arlington, Virginia which provided professional services to the federal government, including in the area of language services.

4. In or about February 2008, the Prime Contractor awarded subcontract MEP-08-0001 to Subcontractor #1. The subcontract was to identify and recruit qualified linguists that were proficient in the Dari and Pashto languages, as well as English, for work on the Contract.

5. Subcontractor #2 was a private company headquartered in Ohio. It provided consulting and assessments for oral and written language skills for both government agencies and private companies.

6. In or about February 2008, the Prime Contractor awarded a subcontract to Subcontractor #2 to administer independent language tests to the linguist candidates identified by Subcontractor #1. This independent testing was conducted during short telephone interviews, known as Oral Proficiency Interviews ("OPIs"), to ensure that linguist candidates identified by Subcontractor #1 met minimum proficiency standards in Dari and Pashto, as well as English, for work on the Contract.

## *The Recruitment Process under the Subcontracts*

7. Subcontractor #1 employed recruiters to identify and recruit qualified linguist candidates for positions on the Contract.

8. During the recruiting process, Subcontractor #1 recruiters collected personal information from linguist candidates they identified—generally the candidate's name, phone number, street address, email address, social security number, and date of birth—and shared it with Subcontractor #2, which used this information to verify the identity of linguist candidates during the OPI tests.

9. The OPI test was scored based on correct answers on a scale of 1 to 5. A score of 3 to 5 was a passing score, and a score of 2 or less was a failed test.

10. Subcontractor #1 sent linguist candidates that its recruiters identified and that met the minimum proficiency standards on the OPI test to the Prime Contractor's Pre-Deployment Processing Center ("PDPC") in Linthicum, Maryland, where the candidates underwent additional testing and training before their deployment to Afghanistan. Usually, the cost of sending a candidate to PDPC included air fare and per diem and would be included in invoices submitted by Subcontractor #1 to the Prime Contractor, and later billed by the Prime Contractor to INSCOM.

11. Subcontractor #1 recruiters were paid a base salary by Subcontractor #1, and could achieve bonuses of between approximately $250 and $2,500 based on how far through a multi-step process, which included PDPC, their linguist candidates progressed ("Recruiting Bonuses"). The Recruiting Bonuses were reimbursable under the Contract.

12. In or about the spring of 2012, the Prime Contractor became aware that surrogates might have taken OPIs for certain candidates. At that time, the Prime Contractor retested and terminated a number of candidates who had passed through the recruiting and deployment process.

### *Shah and his co-conspirators*

13. **SHAH** was employed as a linguist recruiter by Subcontractor #1 from on or about July 1, 2011 through on or about June 1, 2012 based out of his home in the New York, New York area.

14. Co-conspirator #1 ("CC-1") was employed as a regional recruiting manager by Subcontractor #1 from on or about March 3, 2010 through on or about June 1, 2012. She oversaw a team of Subcontractor #1 recruiters working remotely in California and New York which included **SHAH**.

15.     Recruiters 1-4 (individually "R-1," "R-2," "R-3," and "R-4" were recruiters on CC-1's team.

16.     **SHAH** admits that he committed all of the acts discussed in this Factual Basis within the scope of his employment by Subcontractor #1 and for the benefit of Subcontractor #1.

### *The Conspiracy*

17.     From in or about March 2011 to in or about May 2012, in the District of Columbia and elsewhere, SHAH and his co-conspirators, including CC-1, Recruiters 1-4, and others, agreed to engage in a scheme to defraud, and conspired to commit the offenses of major fraud against the United States, in violation of 18 U.S.C. § 1031(a), and wire fraud, in violation of 18 U.S.C. § 1343.

18.     The purposes of the conspiracy were for **SHAH** and his co-conspirators to fraudulently earn bonuses for themselves and their employers by providing false information regarding prospective linguist candidates for the Contract, and to conceal the conspiracy.

19.     The manner and means by which the **SHAH** and his co-conspirators sought to, and did, achieve the purpose of the conspiracy included the following:

   a.     **SHAH** and his co-conspirators, in furtherance of the conspiracy, would transmit or cause to be transmitted by means of wire communication in interstate or foreign commerce writings for the purpose of executing the scheme or artifice to defraud;

   b.     **SHAH** and his co-conspirators would knowingly recruit linguist candidates that did not meet the minimum language proficiency standards in Dari and/or Pashto, as well as English, under the Contract;

   c.     **SHAH** and his co-conspirators would have a surrogate, usually a third-party, but in some cases themselves ("fraudulent test taker"), take OPI tests on behalf of linguist candidates that did not meet the minimum language proficiency standards;

4

d. **SHAH** personally took an OPI test for at least one unqualified linguist candidate;

e. SHAH and his co-conspirators would provide the Prime Contractor with the fraudulent test takers' telephone numbers in place of the linguist candidates' telephone numbers;

f. To conceal the conspiracy, **SHAH** and his co-conspirators would often switch to a foreign language (Dari or Pashto) when discussing the cheating scheme in written and oral communications;

g. When Subcontractor #2 testers would call the telephone number provided for a linguist candidate to administer the OPI test, the fraudulent test taker would use the linguist candidate's personal information to impersonate the candidate and pass the OPI test;

h. The linguist candidate (for whom the fraudulent test taker had passed an OPI test) would be sent to PDPC in Linthicum, Maryland, for additional language testing and training for potential deployment to Afghanistan, with expenses for the travel to Maryland being a reimbursed expense by INSCOM under the Contract;

i. **SHAH** and his co-conspirators received Recruiting Bonuses from Subcontractor #1 based on linguist candidates that were hired because of falsified OPI tests.

20. To accomplish the manner and means of the conspiracy, **SHAH** and his co-conspirators committed the following overt acts, among others:

*Recruiters Took Tests for Unqualified Candidates*

21. On or about September 16, 2011, Candidate #18 failed an OPI test taken on telephone number 678-896-5609, a Georgia area code.

22. On or about September 20, 2011, CC-1 sent an email to **SHAH** stating: "You have to take the Imtehan for [Candidate #18]". The word "Imtehan" translated into English is approximately "test."

23.     On or about September 22, 2011, Subcontractor #2 credited Candidate #18 with a passing OPI test that was administered on telephone number 718-869-0115, a New York-based number associated with **SHAH**, which was also used for at least one other candidate.

24.     The Prime Contractor notified Subcontractor #1 of the result by an email.

25.     In or about late-2011, Subcontractor #1 paid bonuses to, among others, CC-1 ($250) and **SHAH** ($250) relative to the hiring of Candidate #18.

*Recruiters Received Financial Bonuses*

26.     In 2011, **SHAH** received approximately $4,500 in Recruiting Bonuses.

27.     In 2012, **SHAH** received approximately $6,000 in Recruiting Bonuses.

All in violation of Title 18, United States Code, Section 371.

Respectfully submitted,

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

By:     /s/Michael P. McCarthy
Michael P. McCarthy, D.C. Bar #1020231
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W.
Bond Building, Fourth Floor
Washington, D.C. 20530
(202) 305-3995 (McCarthy)
Michael.McCarthy2@usdoj.gov

**DEFENDANT'S ACCEPTANCE**

The preceding Statement of the Offense is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

I have read every word of this Statement of the Offense or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: October 5, 2020

David Shah
Defendant

**ATTORNEY'S ACKNOWLEDGMENT**

I have read this Statement of the Offense, and have reviewed it fully with my client. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: October 5, 2020

Allen H. Orenberg, Esq.
Counsel for David Shah